## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| KARIO-PAUL BROWN, Derivatively on Behalf of CONDUENT INC. <br><br> Plaintiff, <br><br> v. <br><br> ASHOK VEMURI and BRIAN WEBB-WALSH, <br><br> Defendants, <br><br> - and - <br><br> CONDUENT INC., <br> Nominal Defendant. | Case No. 1:21-cv-00239 <br><br> **JURY TRIAL DEMANDED** |

## <u>REDACTED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT</u>

Plaintiff Kario-Paul Brown ("Plaintiff"), by and through his undersigned attorneys, allege the following upon personal knowledge as to all allegations concerning himself, and upon information and belief as to all other allegations based, among other things, upon the investigation conducted by his attorneys, including filings with the United States Securities and Exchange Commission (the "SEC"), materials produced to Plaintiff pursuant to a books and records demand, and filings from various proceedings, including the securities class action case captioned *In Re: Conduent, Inc. Securities Litigation*, Case No. 19-cv-8237 (D.N.J. March 8, 2019), currently pending in the U.S. District Court for the District of New Jersey. Plaintiff believes that after a reasonable opportunity for discovery is afforded, substantial additional evidentiary support will exist for the allegations set forth herein.

## <u>NATURE OF THE ACTION</u>

1.      This shareholder derivative action arises on behalf of Conduent, Inc. ("Conduent" or the "Company") against its former Chief Executive Officer ("CEO") Ashok Vemuri

("Defendant Vemuri") and current Chief Financial Officer ("CFO") Brian Webb-Walsh ("Defendant Webb-Walsh") (collectively, the "Individual Defendants"), for breach of their fiduciary duties of loyalty, care, and candor for intentionally causing or recklessly permitting the Company to (i) breach customer contracts; (ii) make fraudulent representations to investors and stockholders; and (iii) otherwise violate the laws of the United States, including laws of the State of New York.

2.      Conduent began operating as an independent entity on December 31, 2016 when it spun off from Xerox Corporation ("Xerox").  The Company earns billions of dollars in the transportation industry by providing and managing tolling services throughout the United States, including with EZ-pass and no-stop tolling compatible technology.

3.      In early 2017, Conduent announced a Strategic Transformation that called for improvement to its information technology ("IT") infrastructure, a strategic review of inherited third-party vendor contracts, and consolidation of the Company's data, among other things.

4.      Throughout 2017, Defendants assured customers, stockholders, and investors that the Strategic Transformation was on track.  In early 2018, Defendants announced the first phase was complete and reaffirmed their confidence in the Company's progress several times thereafter.   Defendants, however, never disclosed that Conduent lacked the IT resources necessary to support its tolling clients, and that its third-party IT vendor, Atos SE ("Atos"), could not complete the infrastructure improvements contemplated by the Strategic Transformation. Defendants publicly represented that issues with the Company's tolling business were limited and would not materially impact the Company's financial forecast when they knew underlying issues rendered the assurances untrue.

5.      Atos was responsible for deploying software that would inventory Conduent's

legacy IT infrastructure, but Defendants knew Atos was only able to inventory 14% of the Company's systems and that the issue had not and could not be addressed.   Nonetheless, Conduent proceeded without a complete systems inventory in place, causing service issues and network outages for its tolling clients during which the Company's platform did not process tolls.  As a result, tolling agencies from multiple states fined or withheld revenue from Conduent.

6.   By May 15, 2018, the network outages impacted nearly all of Conduent's tolling clients on the East Coast.   On July 30, 2018, two U.S. Senators asked the Federal Trade Commission to investigate Conduent's "pattern of mismanaging cashless tolling systems."[1]  Still Defendants maintained the issues were limited and would not affect the Company's financial results.

7.   The network outages resulted in at least the following contractual penalties, exercised by customers due to Conduent's failure to perform:

- The Florida Department of Transportation ("DOT") fined Conduent $800,000 in August 2018, $4.6 million in March 2019, and $3.7 million in June 2019.

- Governmental entities in New Jersey demanded payment of $5,313,795.59.

- The Texas DOT assessed over $944,303 in penalties.

8.   The outages also caused these customers, and several others, to withhold payments and/or cancel their tolling contracts with Conduent. Defendants knew Conduent's transportation contracts included provisions that allowed the tolling clients to withhold payment for service failures or assess financial penalties against the Company for failing to meet the benchmarks established in the contracts for transaction posting or invoice processing.  They also knew that their inability to serve customers and failure to resolve existing issues would expose the Company to significant penalties under these contracts.

---

[1] Frank Esposito, *Cashless tolls: Problems in New York, other states prompt request for federal probe*, lohud (Aug. 3, 2018).

9.      On November 7, 2018, Defendant Vemuri, disclosed to stockholders and investors for the first time that "continued suboptimal performance from an inherited legacy technology vendor,'" including the vendor's "inability to deliver on service level agreements" and a "poorly structured contract which [Conduent] inherited," as well as the Company's "outdated and historically under-invested legacy IT infrastructure" were material issues causing the Company to lower its revenue guidance.  Analysts were shocked by this revelation, because Defendants had assured the market that the technology issues had already been addressed and that the system was fully inventoried.  The belated revelations resulted in a 29% drop in Conduent's stock price the following day, and immense reputational damages and loss of goodwill in the two years since.

10.     Most recently, Defendants' conduct has forced Conduent to defend a costly class action securities lawsuit.  *In Re: Conduent, Inc. Securities Litigation*, Case No. 19-cv-8237 (D.N.J. March 8, 2019) (the "Securities Action").  In March 2019, purchasers of Conduent common stock filed suit against the Company and Individual Defendants in the U.S. District Court for the District of New Jersey for violations of the Securities Exchange Act of 1934 (the "Exchange Act").  *Id.*  The Securities Action complaint alleges Defendants violated Sections 10(b) and 20(a) of Exchange Act when they "overstated to investors the progress that Conduent was making in modernizing the IT infrastructure supporting its electronic toll collection business."  *Id.*, Dkt. No. 1 at *2.

11.     Plaintiffs in the Securities Action filed an amended complaint on September 13, 2019 (*Id.*, Dkt. No. 18) (the "Amended Complaint"), which Defendants subsequently moved to dismiss.  In denying Defendants' motion, the Hon. Susan D. Wigenton, U.S.D.J., determined:

> The Amended Complaint alleges that Defendants' misrepresentations
> and omissions . . . were material because they created the misleading

impression that Conduent would be able to achieve profitable growth based on its progress with the Strategic Transformation. The value of this information is reflected in Defendants' efforts to routinely inform investors about Strategic Transformation milestones, such as curing legacy IT inefficiencies by addressing the company's sub-optimal vendor relationships and progressing with the company's data center consolidation. . . . Without these misrepresentations, investors could only assume that the Strategic Transformation remained on track, despite Defendants' alleged knowledge to the contrary. . . . That Conduent's progress with the Strategic Transformation was material and impacted investment decisions is also reflected in the sharp drop in the company's stock price following Defendants' revelations that issues with Atos and legacy IT infrastructure negatively impacted financial performance.

*Id.*, Dkt. No. 39 at *13-14.

12.     On October 13, 2020, Plaintiff served Conduent and Courtney Mather, the current Chairman of the Conduent Board of Directors (the "Board") with a demand to inspect the Books and Records of the Company pursuant to New York law (the "Books and Records Request"). Among other things, the Books and Records Request sought minutes of all meetings from January 1, 2017 to December 31, 2018, during which the Company's "Strategic Transformation," including:

- the evaluation of the Company's third-party vendor contracts and inventorying/mapping of the Company's legacy IT infrastructure, in order to prepare to transfer the Company's data from a group of data centers to two consolidated data centers;
- the progress by the Company's IT vendor Atos in inventorying and mapping the Company's legacy IT systems;
- the consolidation of the Company's IT and network infrastructure; and
- the Company's assumption of the direction of the data center migration in or around June 2018 and progress with Atos to map manually the Company's IT infrastructure,

was on the agenda or otherwise discussed at the meeting.  The Books and Records Request also sought minutes from meetings where the Board discussed (i) the Company's tolling network outages; (ii) suspension or termination of contracts by government tolling agencies; and (iii) financial guidance for fiscal year 2018.

13. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████

## JURISDICTION AND VENUE

14.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiff is a citizen of Canada, Conduent is a New York corporation with its principal place of business in the State of New Jersey, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

15.     This court has personal jurisdiction over Plaintiff because Plaintiff submits and consents to personal jurisdiction in New York.

16.     This Court has personal jurisdiction over Conduent and the Individual Defendant because a substantial portion of the wrongdoing alleged in the Complaint took place in and was directed through New York state. Further, the Individual Defendants transacted business through Conduent, a New York Corporation, within the State of New York, and committed tortious acts outside of New York that caused injury within the State.  Conduent and the Individual Defendant have sufficient minimum contacts with the State of New York, and/or otherwise intentionally avail themselves of the markets in the State of New York through the promotion, marketing, and sale of Conduent's products in this State to render the exercise of jurisdiction by this Court permissible under the traditional notions of fair play and substantial justice.

17.     New York was also a focal point for the misconduct. Throughout 2018, Conduent's system failed to process tolls on several of New York's bridges and roads across the

state.  Conduent's failures resulted in late bills being issued, which included excessive fines for users. (Securities Answer, at ¶ 114).[2]  Defendants admitted in the Securities Action that tolling agencies from New York withheld revenue as a result. (*Id*. at ¶ 17).

18.     Evidence relevant and necessary to prove Plaintiff's claims – including the location of important physical and documentary evidence and witnesses able to provide live testimony – is located in New York.

## PARTIES

19.     Plaintiff Kario-Paul Brown, citizen of Canada, is and was at all relevant times a holder of Conduent common stock.

20.     Defendant Ashok Vemuri was Chairman of the Board and Chief Executive Officer of Conduent from the Company's inception in January 2017 to August 2019.

21.     Defendant Brian Webb-Walsh has been Conduent's Chief Financial Officer, Executive Vice President, and a member of the Board since January 2017.

22.     Nominal Defendant Conduent is a New York corporation with its principal executive offices located in Florham Park, New Jersey.  (Securities Answer, ¶ 33).

## SUBSTANTIVE ALLEGATIONS

### Conduent Begins Operating as an Independent Entity on December 31, 2016

23.     On January 29, 2016, Xerox announced its plans to separate into two independent, publicly traded companies: Xerox, a document technology and outsourcing company, and Conduent, a business process services company.

24.     On June 14, 2016, Xerox announced Defendant Vemuri as CEO of Conduent upon the completion of the separation of Xerox.

---

[2] *Employees Ret. Sys. of the P.R. Elec. Power Auth. v. Conduent Inc*., Case No. 19-cv-8237, 2020 U.S. Dist. LEXIS 99287, Dkt. No. 46 (D.N.J. June 5, 2020).

25.     On December 31, 2016, Conduent spun-off from Xerox Corporation and began operating as an independent, publicly traded company.

26.     On January 3, 2017, Conduent started trading as an independent public company.

**Conduent Earns Billions Providing and Managing Tolling Services in the United States**

27.     Conduent provides business process services, including managing operations involving high volume, repeatable, and individualized digital interactions on behalf of its clients. Examples of these digital interactions include payments, collections, benefit administration, and end-user communication services.

28.     In its annual report for the year ended December 31, 2017, filed with the SEC on Form 10-K on March 1, 2018 (the "2018 Form 10-K"), the Company reported that it operated in two reportable segments: the Commercial Industries segment and the Public Sector segment. Conduent's Public Sector segment included the Company's Government and Transportation Services enterprises.  According to the 2018 Form 10-K, "Conduent's services include support for electronic toll collection…[and managing] key processes on behalf of [its] clients including fee collecting, compliance and violation management, notifications, statements and reporting."

29.     Conduent manages approximately 50% of tolling systems in the United States. The 2018 Form 10-K states that states that the Company "maintain[ed] an approximately 54% market share position in electronic toll collection in the United States based on toll revenues collected through the Company's systems in 2017."

30.     Conduent's tolling services offers a platform that recognizes and validates in-car transponders to raise the barrier at the toll location (*e.g.*, E-ZPass), and performs back office financial reconciliation, financial processing, and billing distribution.  Conduent's Transportation Services also support a system that eliminates toll booths altogether called all-electric tolling,

which allows vehicles to pass under an automated toll checkpoint instead of stopping or slowing down at a toll booth.  Conduent's technology reads the transponder to collect the toll or uses license plate recognition to identify the vehicle and bill the vehicle owner.

31.     Conduent claims its Transportation Services "can transform the way the world travels and advance the transportation landscape.  We integrate innovative technologies, advanced analytical capabilities and end-user-focused solutions to deliver faster, safer and more economical experiences for travelers and real-time revenue management for governments, transportation agencies and authorities."[3]

**Conduent's Tolling Business Was Crucial to the Company's Success**

32.     In 2017, Transportation accounted for approximately 14% of the Company's total revenue.

33.     On August 9, 2017, during the Company's second quarter earnings call, Defendant Vemuri stated that Conduent would identify Transportation as a "core business[]" moving forward.[4]

34.     In 2018, Conduent segregated its Public Sector segment into Government Services and Transportation segments. (Securities Answer, ¶ 54).  According to Conduent's 2018 Annual Report, filed with the SEC on Form 10-K on February 28, 2020 (the "2019 Form 10-K"), the Company's Transportation Services segment generated $0.7 billion in 2018, representing 13.5% of the Company's total revenues.    Conduent's tolling business accounted for 41%, or approximately $299 million, of Conduent's Transportation Services segment revenue and

---

[3] Conduent Inc., Transportation, available at https://transportation.conduent.com/ (assessed Nov. 9, 2020).

[4] Defendant Webb-Walsh also told investors on the call that Transportation was a core business, and stated, "there should be more clarity around core and noncore. And we continue to talk about some core businesses such as transportation, HR, outsourcing, our workers comp business, our compliance business and financial services business. We've talked about those as core, and we continue to believe they are core."

approximately 5.5% of the Company's total revenues in 2018.  (Securities Answer, ¶ 56).

35.     In the Securities Action, Defendants admitted: "During the Class Period, the Company's core Transportation business involved managing back office tolling operations for state and local government clients."  (*Id*. at ¶ 183).

**Defendants Claimed Reliance on Technology Would Generate Profitable Growth and Held its Tolling Services Out as an Example of How to Do That**

36.     Soon after Conduent became an independent entity, Defendant Vemuri stated that the Company's goal was to "win business that is highly repeatable, and supported by platform-based offerings." Conduent acknowledged that it had to become a company that significantly relies on technology to service its clients to accomplish this goal.

37.     On June 8, 2017, Alan Katz, Conduent's Vice President of Investor Relations stated to investors, "we're moving from more of a siloed organization where we have technology that we implement in certain clients and not in all clients. We're moving away from that and we're going to utilize technology across the board. Again, moving towards platform-based offerings...."

38.     On November 8, 2017, during the Company's third quarter earnings call, Defendant Vemuri acknowledged that, at that time, "[o]ver 60% of [Conduent's] business is delivered from platform-enabled services, and I see room for increasing that moving forward."

39.     Defendant Vemuri reiterated this sentiment in an interview with Strategy + Business magazine, stating that to generate profitable growth, Conduent "must have leading technology and software platforms" to help clients manage the interactions with the people they serve, and "[Conduent's] execution and delivery of these services must be exceptional."[5]

40.     Defendants pointed to the Company's Public Sector business, and specifically its

---

[5] Daniel Gross, *Shifting a Corporate Culture at Scale — and with Speed*, Business + Strategy (May 1, 2018).

electronic tolling operations, as an example of how the Company was successfully utilizing platform-based technology to support its clients who rely heavily on automation technology.

41.    On June 8, 2017, at the Robert W. Baird Global Consumer, Technology & Services Conference, Alan Katz held out to investors the Company's Public Sector business, particularly electronic tolling, as a model IT and platform-based solution for growing and scaling all of Conduent's business segments:

> So if you look at our public sector business, I think this is really a good example of how we've successfully implemented platform-based solutions where we're about to leverage IP, IT and expand across multiple clients and grow the business. I'll point out a couple of really good examples. So electronic tolling. We're in the top 2 electronic tolling platform – tolling providers in the country. We operate in multiple countries, actually. And I'm sure lots of you are familiar with E-ZPass, we run E-ZPass tolling up and down the East Coast. This is a platform that we're able to just go to multiple clients and we can reuse probably between 80% and 90% of the platform…So its investing in platforms like that, that will allow us to grow the business and expand to numerous clients. And again, the goal is to make the business simple, repeatable, scalable and more IP and IT based.

42.    On November 8, 2017, during the Company's third quarter earnings call, Defendant Vemuri stated that the Company's Public Sector segment, which at the time included Transportation Services and tolling, "illustrates the characteristics of our core business model where technology platform assets are combined with a variety of business services to support a range of distilled interactions with the constituents of our clients."

43.    On November 14, 2017, Alan Katz and David Amoriell, Conduent's Executive Vice President & President of Public Sector, spoke to investors at the JPMorgan Ultimate Services Investor Conference about the Company's shift towards technology-centric platform offerings for its clients. Amoriell highlighted the Company's Public Sector business as an example of how Conduent is already deploying technology successfully:

> [Speaking about] the public sector - [w]e have the platforms, the

intellectual capital to be competitive there and really the focus there is around our platforms and bundled offerings we're taking to our clients…It's allowed us to drive good margins in this business, right? It's a segment that's grown about 5%, give or take a percent point, depending upon whether it's transportation or the state local or federal government marketplace, right. But it's a business, I think, well positioned to go forward in terms of the technology and the domain expertise that we have.

44.     On February 21, 2018, during the Company's fourth quarter earnings call, Defendant Vemuri stated "[p]ublic sector in many ways best exemplifies those characteristics we define as core: Technology platform solutions supported with a range of corresponding business services…Going forward, we will be targeting growing segments like transportation…."

**Defendants Announce a Strategic Transformation plan in Early 2017 to improve IT infrastructure and to review third-party vendor contracts**

45.     In order to become the technology focused company that Defendants envisioned, Conduent announced what it called a "Strategic Transformation" on February 22, 2017, during Conduent's first conference call with investors since becoming an independent entity.

46.     The initial phase of the Strategic Transformation included:

   a.   inventorying and improving the Company's IT infrastructure;

   b.    evaluating the Company's third-party vendor contracts;

   c.   preparing to transfer and consolidate the Company's data from a group of data centers to two consolidated data centers;

   d.   transitioning to a more reliant automation and platform-based offerings; and

   e.   conducting a full strategic review of the Company.

47.     Consolidating Conduent's data centers involved migrating the Company's data from several existing data centers to a few centralized locations, which required third party assistance.  Accordingly, Conduent entered into a contract with Atos to inventory its legacy IT infrastructure necessary for the data center transfer. (Securities Answer, ¶ 73).   Defendants

admitted in the Securities Answer that "Atos produced and executed data migration plans that were reviewed by certain personnel at Conduent." (*Id.*).

48.     At various times in 2017, Defendants represented that these improvements and third-party contracts were part of their plan to grow the company by relying on technology, and they specifically identified the platform-based technology supporting Conduent's tolling operations as a model for profitable growth.

49.     Defendant Vemuri explained that the purpose of the Strategic Transformation was to address an unfocused portfolio, redundant systems, inconsistent processes, unreliable management information, and improve the Company's operations. He informed shareholders and investors that, in short order, "Conduent will suddenly look like a very different Company than the one recently separated from Xerox."

50.     The day the transformation was announced, Defendant Vemuri emphasized on a call with investors the importance of reliable performance:

> Number one, it is also incumbent upon us to ensure that we are delivering to the contract that we have signed. ***We are driving a higher degree of automation and better processes, delivering them with appropriate optimal solutions. Delivering them from the right locations, and ensuring that the quality of the service delivered does not invite penalties***. [Emphasis added].

51.     In a same day press release, Defendant Vemuri stated, "Our near-term focus is on strengthening client relationships, completing the buildout of our management structure**,** and continuing the success of our strategic transformation program critical in reaching our margin expansion goals."   The press release said the following about the Company's "Financial and Strategic Outlook":

> Conduent's long-term financial outlook remains unchanged from what was outlined at the December 2016 Investor Event, and the company is continuing to execute against its strategic transformation

program.

The strategic transformation continues to progress as expected. Our efforts extend throughout the organization and are focused on multiple aspects of the business, including modernizing platforms, refocusing our innovation group, and expanding verticalization in our core markets," said Brian Webb Walsh, Conduent CFO. "These initiatives will strengthen our foundation for the future."

**Throughout 2017, Defendants Maintain That the Strategic Transformation Program Is On Track**

52.     Defendants provided updates to investors regarding the Company's progress with respect to the Strategic Transformation initiative throughout 2017. (Securities Answer, ¶ 74).

53.     On May 10, 2017, during a conference call with analysts and investors, the Individual Defendants stated the Strategic Transformation was "on track."

54.     On August 9, 2017, the Individual Defendants similarly touted the progress of the Strategic Transformation during a conference call.  Defendant Vemuri reminded investors that "[s]trategic transformation is essential to this first phase of our turnaround plan."  He stated further,

I will go into more detail on our Strategic Transformation progress.… Conduent inherited a sprawling fragmented and costly operational structure that restrained our execution and competitiveness. Aligning our cost structure and operational footprint with industry benchmarks is foundational to our turnaround plan. ***We are getting our arms around this opportunity, and the results are starting to show***. [Emphasis added].

55.     On the call, Defendant Webb-Walsh confirmed Conduent was focused on improving the Company's internal systems and made the necessary hires to ensure the Company could run: "We have been investing in our people, platforms and internal systems.  We have hired the talent that we need to lead the organization from both a functional and operational perspective."

56.     Defendant Vemuri stated on the call that whether Conduent "[has] the appropriate

14

IT and talent and technology" was a consideration when determining if Conduent should continue a client relationship.

57.     On November 8, 2017, Defendants claimed the Strategic Transformation was on track through the third quarter of 2017.   Defendant Vemuri spoke about the Strategic Transformation's accomplishments during a conference call with analysts that day saying,

> During the third quarter, we made *major strides in centralizing our technology ecosystem*, including standardizing our internal systems, *investing in tolls and consolidating disparate internal platforms*. Collectively, this work is contributing to a more agile, productive and contemporary work environment. (emphasis added).

58.     Defendant Vemuri acknowledged on the call that Conduent was still constrained by its IT, stating, "[t]he highly fragmented structure we inherited include[ed] a disjointed IT infrastructure that has impeded productivity and performance as an organization."  However, he reminded investors that Conduent had the "team, resources and offerings" to be a "best-in-class provider of technology-enabled business service solutions" for its clients.

59.     *Defendant Vemuri later admitted he was aware of at least 20 data center outages during Conduent's first two months of operation in 2017,* and that during Conduent's first 60 days of operation, he met with approximately 25 of Conduent's top clients and learned that the Company had problems managing its data.[6]

**Defendants Announce Completion of the First Phase of the Strategic Transformation Plan in Early 2018**

60.     On February 21, 2018, during the Company's fourth quarter earnings call, Defendants represented to investors that Conduent had completed the initial phase of the Strategic Transformation and cured inefficiencies stemming from legacy contracts, stating that, "[*i*]*n 2017, we addressed our sub-optimized IT-related workforce and vendor relationships.*

---

[6] Daniel Gross, *Shifting a Corporate Culture at Scale — and with Speed*, Business + Strategy (May 1, 2018).

*Next we expect to see benefits from the platform rationalization work completed last year*." (emphasis added).

61.     Defendant Vemuri told investors that Conduent had successfully inventoried the Company's legacy IT systems, stating, "During our first year, we needed to inventory and rationalize our technology portfolio.  Starting in 2018, we'll begin our work to modernize our offerings with cutting-edge technology."  He claimed Conduent now had a map of its IT infrastructure, which would allow it to start investing in IT infrastructure upgrades.

62.     Defendants also issued FY2018 revenue guidance, with a revenue range of $5.625 billion to $5.799 billion and adjusted EBITDA in the range of $707 million to $733 million.  The guidance stated that the company "expects[s] transportation [revenue] inside of Public Sector to grow in 2018."  Defendant Webb-Walsh claimed that projected FY2018 EBITDA growth of between 8% and 12% was due in part to the positive results of the Company's Strategic Transformation program.

63.     *However, Defendants had not addressed its sub-optimized IT vendor relationship and the Company lacked the systems inventory of the Company's legacy IT infrastructure that Defendants lead shareholders and investors to believe had been completed*. The failure to complete the inventory and map all of the systems to be transferred as part of the data migration before the network cutover to the new data center exposed the Company to significant liability, including because it caused network outages that meaningfully affected the Company's tolling customers.

**After February 21, 2018, Defendants Falsely Reassured Stockholders that Issues with its Tolling Business Would Not Materially Impact the Company's Financial Forecast**

64.     ███████████████████████████████████████████████████

███████████████████████████████████████████████████

65.

66.

67.

68.  In a May 1, 2018 interview with Business + Strategy Magazine, Defendant Vemuri admitted he was aware of at least 20 data center outages during Conduent's first two

months of operation in 2017.[7]  He stated that he was deeply involved in overseeing Conduent's technology and was surprised that Conduent was operating its business using what he called a "1990s ecosystem" of mainframes and data centers, while "everybody else had moved to off-premise systems, moved into the cloud."   Defendant Vemuri admitted further that during Conduent's first 60 days of operation, he met with approximately 25 of Conduent's top clients and learned that the Company had problems managing its data.[8]

69.    On May 9, 2018, during Conduent's first quarter 2018 earnings conference call, Defendant Vemuri provided an update on the Strategic Transformation, stating that real estate "and IT consolidation remain large contributors to our transformation work and are ***progressing well***." (emphasis added).

70.    Conduent also informed stockholders and investors that it was reducing its FY2018 revenue guidance to between $5.44 billion and $5.64 billion and its adjusted EBITDA guidance to between $672 million and $698 million. (Securities Answer, ¶¶ 94, 152).

71.    Defendant Webb-Walsh stated that these reductions were caused by the Company's strategic divestiture of businesses deemed non-core that were scheduled to close in the following quarter.  ***He added but for the Company's strategic divestiture "the guidance ranges that we provided during the last earnings call would not have changed."*** (emphasis added).  He also stated, "We updated our guidance for the impact of the recently signed divestitures, but excluding these factors, we would have been in-line with our previous guidance." (Securities Answer, ¶ 98).

72.    Defendants did not cite IT infrastructure issues, third-party vendor performance issues, or client delivery issues as reasons for revising Company's FY2018 guidance on May 9,

---

[7] Daniel Gross, *Shifting a Corporate Culture at Scale — and with Speed*, Business + Strategy (May 1, 2018).

[8] *Id*.

2018.

73.     Defendants reported that Public Sector revenue "was down 5% sequentially as a result of some lower volumes from some transportation clients" but remained positive with respect to its Transportation business, stating they "still expect to show growth in this area of the business in 2018 as a large tolling contract is expected to ramp by the end of Q2."

74.     On May 15, 2018, the New York Thruway Authority announced that, throughout 2018, Conduent's system failed to process tolls on several of New York's bridges and roads across the state, including the Mario M. Cuomo and the Grand Island Bridge in Erie County. Conduent's failures resulted in late bills being issued, which included excessive fines for users. (Securities Answer, ¶ 114).  As a result, the Thruway Authority issued a press release the same day announcing an amnesty program to absolve New York drivers of more than 281,000 violations worth more than $1.4 million for the Mario M. Cuomo Bridge that were caused by processing issues with Conduent's cashless tolling system. The Thruway Authority confirmed that Conduent knew of these issues, stating that it was working with Conduent "to simplify the Tolls by Mail website."

75.     ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████

76.     ███████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████

77.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████

78.     On June 1, 2018, Conduent was contractually obligated to complete a tolling project for the Maryland Transportation Authority.  Conduent knew failure to timely complete the project could result in penalties, forgone revenue, and/or cancellation of the contract. The project, however, was never completed.

79.     On June 4, 2018, Florida's tolling systems, which Conduent supported, were due to go offline for system updates.  In conducting this update, Conduent caused a month-long system outage that created a backlog of approximately 170 million transactions and processing delays that resulted in customers being mischarged late fees.

80.     On June 8, 2018, during Conduent's Analyst Day, the Company issued a press release announcing financial results for the first quarter of fiscal year 2018.  The Company further reduced its FY2018 revenue guidance to between $5.41 billion and $5.61 billion and its EBITDA guidance to between $662 million and $688 million from the previous range of $707 million to $733 million. (Securities Answer, ¶ 157).

81.     Defendants again failed to disclose that it was experiencing problems with its IT infrastructure and its tolling services.

82.     Defendant Webb-Walsh stated that the changes to the Company's guidance

resulted from a strategic divestiture and "still expect[s] to grow organically in Q4 of this year."[9]

83.     Defendant Vemuri stated, "We've taken back our critical network infrastructure as well as our client-facing application from service providers to who we had outsourced for better control and performance by ourselves."  He did not, however, disclose the Company's IT problems as a reason for the change.  Instead, he stated:

> We're also aggressively attacking our IT infrastructure with a goal of consolidating down to 2 primary data centers and a single network backbone by 2020. We've taken back our critical network infrastructure as well as our client-facing application from service providers to who we had outsourced for better control and performance by ourselves.

84.     On July 11, 2018, New York State Comptroller Thomas P. DiNapoli issued a press release stating that since cashless tolling was expanded to all nine crossings managed by Conduent for the Triborough Bridge and Tunnel Authority ("TBTA") the number of unbilled tolls increased dramatically.

85.     On July 16, 2018, the Florida DOT announced that it would withhold all future payments to Conduent as a result of the June outage, until the SunPass Centralized Customer Service System was fully operational. (Securities Answer, ¶ 128).  It also vowed to hold Conduent accountable to the fullest extent possible under their contract.

86.     On July 17, 2018, New York State Senator Carlucci said the New York Thruway Authority was discussing a potential $470,000 fine to Conduent for non-performance under their contract.  A statement from the Thruway Authority stated that "[u]nder the existing contract, Conduent has been – and will continue to be – penalized financially each and every time they underperform."[10]

---

[9] Defendant Webb-Walsh also stated: "We have provided an update to our full year 2018 guidance to account for the most recently signed divestiture, the Commercial vehicle operations business. Similar to the guidance revision on our Q1 earnings call, the only change we are making to guidance are as a result of this divestiture."

[10] Alison Dune, *HV Lawmakers To NYS Thruway Authority: Cancel Cashless Tolling Contract*, WAMC (July 17,

87.     Also in July 2018, NJ Agencies exercised – for the fourth time – their contractual right to assess financial penalties for non-performance against Conduent. Conduent Vice President Thomas Dorazio executed a fourth addendum recognizing that the NJ Agencies were exercising their contractual right to assess these penalties.

88.     On July 30, 2018, Florida Senator Bill Nelson and Michigan Senator Gary Peters sent a letter to Joseph Simons, Chairman of the FTC, calling on the agency to investigate Conduent for its "***pattern of mismanaging cashless tolling systems***." (emphasis added). Senators Nelson and Peters identified reports of issues with cashless tolling systems in several states including, Florida, Michigan, California, Texas, New Hampshire, and Maryland.

89.     On August 8, 2018, Conduent announced financial results for the second quarter of 2018. ***Conduent did not change its FY2018 revenue and adjusted EBITDA guidance from the Company's Analyst Day of June 8, 2018***. (Securities Answer, ¶ 104).[11]

90.     On the earnings call, Defendant Vemuri acknowledged that Conduent was experiencing performance issues with one tolling contract, but did not disclose the underlying issues, and instead falsely stated that tolling issues were isolated to a single client: "a tolling contract with a state government agency." He added:

> In terms of the tolling contract, ***we typically don't comment on the financials around one specific contract***. We're obviously working to remediate the situation. But what I will say is we just confirmed our guidance in revenue, free cash flow, and adjusted EBITDA. So at this time, ***we don't anticipate it having an impact on our ability to meet our guidance***. (emphasis added)

91.     Defendant Vemuri affirmatively stated Conduent had "the capability to efficiently

---

2018).

[11] On August 8, 2018, Conduent announced its financial results for the second quarter. In the Company's second quarter earnings announcement, Conduent reaffirmed its FY2018 revenue guidance of between $5.41 billion and $5.61 billion and its adjusted EBITDA guidance of $662 million and $688 million.

resolve these issues."

92.     Defendant Webb-Walsh stated Defendants did not "***anticipate [the issue with the tolling contract as] having an impact on our ability to meet our guidance***." (emphasis added).

93.     On August 14, 2018, the Orlando Weekly reported that the Florida DOT would fine Conduent $800,000 as a result of the outage caused by the Company's June 2018 failed system upgrade.[12]

94.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

95.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████

96.     ████████████████████████████████████████████████
██████████████████████

97.     ████████████████████████████████████████████████
████████████████████████████████████████████████████████

[12] Adrianna Iwasinski, *SunPass backlog caught up; Florida contractor fined $800,000*, ClickOrlando.com (Aug. 15, 2018) available at https://www.clickorlando.com/news/2018/08/15/sunpass-backlog-caught-up-florida-contractor-fined-800000/.

██████████████████████████████████████████████████

98.    On October 12, 2018, Conduent announced retirement of its President David Amoriell effective January 11, 2019.

99.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████

100.    ███████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████

24



101. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████

**The Truth Emerges**

102.    On November 7, 2018, Defendants finally revealed the truth to the market.  In an earnings press release and analyst conference announcing its third quarter financial results, Defendants admitted that the underlying issues affecting tolling client services had materially impacted Conduent's financial performance and caused the company to lower its FY2018 guidance.  Conduent reported adjusted net income of $61 million for the third quarter of 2018 and reported $0.28 in adjusted diluted earnings per share from continuing operations. (Securities Answer, ¶ 166).  Conduent reported $1.304 billion in revenue, a decrease of 11.9% compared to the prior year quarter and about 2.8% below analyst expectations. *Id*.  It also reduced its fiscal year 2018 earnings and revenue guidance. The Company cut its revenue guidance 2.5% to $5.34 to $5.40 billion (from $5.41 to $5.61 billion) and reduced its Adjusted EBITDA about 4% to $640 to $650 million (from $662 to $688 million) (*Id*. at ¶¶ 141, 167).

103.    During the earnings call that day, Defendant Vemuri stated:

    "[W]e have had continued ***suboptimal performance*** from an inherited

legacy technology vendor. The performance issues stem from the vendor's inability to deliver on service level agreements, lack of responsiveness to Conduent's needs, and poorly structured contracts which we inherited. We had our first planned data center migration in Q3 and during this migration *we uncovered issues that cause significant disruption to our client delivery and operations and resulted in penalties to Conduent*." (emphasis added).

104.    Defendant Webb-Walsh was quoted in the accompanying press release as saying, "Our updated guidance reflects recent technology and infrastructure performance issues which are being addressed, divestiture impacts, and timing and slippage of new business."

105.    Defendant Vemuri also admitted that Conduent was locked into a relationship with its legacy vendor, Atos, to provide infrastructure support and he was aware that Atos had been unable to meet its obligations while responding to analysts during the call:

> Number one is that we did inherit a very challenged infrastructure both from a network perspective, the quality of the assets *and unfortunately a contract that necessitated us to continue to work with the service provider that we had engaged with prior to the formation of Conduent.* We have addressed just like we address the client facing application issue with another large service provider that [we] work with outsource to our prior to the formation of Conduent last year similarly - we have addressed this issue for the last six months to seven months. *As we have progressed from more labor intensive work to digital technology work, the impact of the nonperformance of this has become severely amplified resulting in penalties* as Brian mentioned as well as detriment of Revenue that's one of the reasons that we gave for the change in guidance. (Emphasis added).

106.    Defendant Vemuri reiterated that the Company was long aware that it was constrained by the limitations of its existing infrastructure and sub-optimized vendor relationship:

> **Jim Suva – Citigroup Inc.:** Thanks. Ashok, you've been there now for quite a bit of time, and you successively did a lot of divestitures. But I guess the surprising thing of laying out five different issues now, I think is catching investors in the stock off, off guard today of the reaction. *Things like outdated infrastructure and stuff shouldn't be a surprise today, and now they're really kind of coming out. So what did you*

*uncover, or is this just a new look under the covers or a new chapter, or how should we think about, why now as opposed to 12 months, 14 months, 15 months, 18 months ago?* (Emphasis added).

**Vemuri:** From an infrastructure and network perspective, the work was started last year it takes time for it to sort of unravel or for the results to good or bad to become to be revealed. *And since we were constrained by the service provider that we used -- we were EE challenged, and this out of [sic] blow up in our face if you will or got amplified, as we moved more and more of our capabilities and our business from labor base to more technology base and the amplification became extremely apparent in our results as you have seen in this particular quarter. This is not a new issue. We've been addressing this for a while. The impact of this has suddenly accelerated and got amplified. We've been working on it.* This has forced us to make the changes much more quickly. Those changes have already been made. We've hired talent within the company. We've hired external experts and vendors and professionals who can help us in this journey because *trust me we understand the impact of this on not only our financials, but the impact it has on our clients' performance and our ability to deliver the services to them.* (Emphasis added).

107.    Conduent stock closed at $19.20 per share on November 6, 2018.  The next trading day, November 7, 2018, Conduent stock closed at $13.62 per share, a decline of $5.58 per share, or 29%. (Securities Answer, ¶¶ 27, 207).  The November 7 disclosures also caused numerous analysts to slash price targets and downgrade the Company's stock.

**Conduent's Problems Continue**

108.    On April 8, 2019, Michael Nevin resigned from the Board and was openly critical of the Company's leadership, including with respect to Defendant Vemuri. (Securities Answer, ¶ 193).  Nevin's resignation letter stated:

Over the last few months, I have voiced a number of concerns regarding various matters relating to Conduent's operations, policies and practices.  Unfortunately, *little action has been taken to address these issues*, and I believe the main roadblock to meaningful change has been the company's Chairman, Bill Parrett.  Every company needs a strong chairman who is willing to do the heavy lifting that is often necessary to rein in the natural autocratic proclivities of management – especially when the company is underperforming to the extent Conduent is.  In my

27

view, Bill has simply been asleep at the switch while the company has lost almost 50% of its market value.

***

As a member of the Corporate Governance Committee, one would think that I'd have had advance notice of the ill-advised decision of our Chief Executive Officer, Ashok Vemuri, to join the board of directors of Kroger. Instead, I learned about this development by reading it in the newspaper! Only later did I learn that Chairman Bill Parrett was aware in advance of the actions that Ashok was contemplating taking but did not deem this information worthy of sharing with me or other board members. Had my opinion been sought in advance, I would have expressed my extreme concern that this new position had the potential to distract Ashok's attention away from his duties at the company at the precise moment when his full attention was required most. ***Ashok, with Chairman Parrett's acquiescence, determined to take this board seat only a few short months after negative disclosures by Conduent resulted in the evaporation of almost half the company's stock market valuation in a matter of weeks. How Bill could have missed or ignored this glaringly obvious red flag is a mystery.*** The only answer that makes any sense to me is that he was asleep at the switch, as he has been in so many instances during his tenure, or perhaps he was distracted by his myriad other responsibilities as a director of Oracle, Blackstone, Eastman Kodak and UBS Americas. When I confronted Bill, I received a "***mea culpa***" for his not giving me and other board members earlier notice and a promise that in the future this would never happen again. I also insisted that changes be made to the company's Corporate Governance Guidelines in order to prevent this sort of thing from happening again, which were ultimately implemented (after significant pushback from Bill). (Emphasis added).

109.    On May 8, 2019, Conduent announced that Defendant Vemuri intended to step down as CEO and as a member of the Board of Directors, and that to ensure an orderly transition, he would continue in his then-current role as CEO and as a member of the Board of Directors until his successor was appointed, which the Board expected to occur during the third quarter of 2019. (Securities Answer, ¶ 196).

110.    On May 22, 2019, Conduent Transportation, a business unit of Conduent Incorporated, announced the appointment of Scott Doering as general manager, Road Usage Charging, and that Mr. Doering would lead Conduent Transportation's tolling operations and

28

would also shape its vision for the future. (*Id.* at ¶ 197).

111.    Defendant Vemuri left the Company on August 6, 2019.

112.    On August 26, 2019, another former member of the Board, William Parrett, "who was singled out…for contributing to the company's falling fortunes" resigned from the Company.[13]

113.    Conduent stock is presently trading at approximately one-quarter of its closing price on November 7, 2018.

**The Board Failed to Discipline or Take Action the Individual Defendants**

114.    The Board learned of the Individual Defendants' wrongdoing sometime between 2017 and November 7, 2018.  Yet Defendant Vemuri remained CEO of Conduent until August 2019, more than 10 months after the latest possible day the Board could have known of the Individual Defendants' breaches.  And even then, Conduent did not terminate Defendant Vemuri's employment.  He announced his voluntary resignation in May 2019 and remained CEO until August .

115.    Not only did the Board fail to take action against Defendant Vemuri, it rewarded him with millions of dollars in salary increases.  Defendant Vemuri's total salary in 2017 and 2018 was $6,657,736 and $7,066,017, respectively.  In 2019, the Board authorized a $11,843,058 salary, representing a more than 4.5M increase from the two previous years, and despite the fact that he was only an employee of the Company for eight months that year.

116.    The Board also failed to take action against Defendant Webb Walsh, who remains CFO of Conduent to this day.  To the contrary, and much like Defendant Vemuri, Conduent rewarded Defendant Webb Walsh with significant salary increase in 2019.  Defendant Webb

---

[13] O'Ryan Johnson, *Conduent Board Member Who Sparred With Icahn Appointee Resigns*, CRN (Aug. 29, 2019).

Walsh's total salary in 2017 and 2018 was $1,486,152 and $1,961,273, respectively. In 2019, the Board authorized a $4,805,218 salary, representing a more than 2.8M increase from the two previous years.

**Penalties and Forgone Revenue Due to Performance Failures**

117.    Defendants admitted in the Securities Action that tolling agencies from New York, Maryland, New Jersey, and Texas have previously withheld revenue from or invoked their contractual right to issue penalties to Conduent. (Securities Answer, ¶ 17).

118.    Defendants knew the Texas DOT fined Conduent on seven separate occasions from March through October 2018 for failing to meet contractual performance standards. The Texas DOT sent monthly letters to Timothy Souder, Conduent's program manager, that accessed over $944,303 in penalties to Conduent for the Company's failure to meet key performance indicators, including $196,890 in April 2018 for missing 618,192 tolling transactions.

119.    Defendants knew that in July 2018, Conduent Vice President Thomas Dorazio executed a fourth addendum to Conduent's service contract with various NJ Agencies, recognizing that the NJ Agencies were exercising the contractual right to assess financial penalties for non-performance against Conduent. The New Jersey Turnpike Authority assessed $4,413,056 in penalties for violations and failure to meet key performance indicators established in the contract and claimed $307,000 for lost tolls from October 2017 through March 2018. The remaining NJ Agencies assessed an additional $455,217.59 in penalties and claimed $138,522 in lost tolls. Defendants knew that, in total, the NJ Agencies demanded payment of $5,313,795.59 from Conduent for failing to meet the requirements of the service contract from October 2017 through April 2018.

120.    On July 16, 2018, the Florida DOT announced that the department would

withhold all future payments to Conduent until the SunPass Centralized Customer Service System is fully operational. (Securities Answer, ¶ 128). To date, Florida fined Conduent $800,000 in August 2018,[14] $4.6 million in March 2019, and $3.7 million in June 2019 for failures under their tolling contract.

121.    The New York Thruway Authority's contract with Conduent contained several provisions that allowed the Thruway Authority to suspend payment to Conduent:

- Under Article 8.01(b) of the Thruway Authority's contract, "[w]hen, in the opinion of the [Thruway] Authority, reasonable grounds for uncertainty exist with respect to the Contract's [i.e. Conduent's] ability to perform the Services or any portion thereof, the Authority may…(i) treat such failure as a repudiation of the    Agreement…and (iv) suspend the Contractor's performance hereunder."

- Under Article 8.04(b) of the Thruway Authority's contract, in the event of unsatisfactory performance, Conduent "shall reimburse the Authority for any revenue, which the Authority identifies as having been lost due to the fault of the Contractor."

- Under Article 3.01, the Thruway Authority's obligation to pay Conduent is "contingent upon the Authority's finding that the Contractor has performed in a competent and professional manner satisfactory to the Authority."

122.    Under the Thruway Authority's contract, the Thruway Authority also has the power to assess penalties for failure to meet performance standards.  On July 17, 2018, an article published by wamc.org quoted State Senator Carlucci as saying that the Thruway Authority discussed fining Conduent approximately $470,000 for non-performance.  In a statement, the Thruway Authority stated "[u]nder the existing contract, Conduent has been – and will continue to be – penalized financially each and every time they underperform."[15]

123.    The Maryland Transportation Authority also exercised its right to withhold

---

[14] Adrianna Iwasinski, *SunPass backlog caught up; Florida contractor fined $800,000*, ClickOrlando.com (Aug. 15, 2018) available at https://www.clickorlando.com/news/2018/08/15/sunpass-backlog-caught-up-florida-contractor-fined-800000/.

[15] Alison Dune, *HV Lawmakers To NYS Thruway Authority: Cancel Cashless Tolling Contract*, WAMC (July 17, 2018).

payment from Conduent for non-performance related to Conduent's technology failures.   On

October 30, 2018, Gerald Noonan, Contract Manager for the Maryland Transportation Authority

sent a letter to Conduent Program Manager Thomas Krueger informing Conduent that it would

be withholding $1.9 million designated for a project that was due on June 1, 2018 and remained

incomplete 150 days later.

124.    The Michigan Department of Transportation's contract with Conduent similarly

contained a provision that allowed it to withhold payment. § 12.4 states "the State may, without

waiving any other rights under this Contract, elect to withhold payments due to Contractor under

this Contract such amounts that are in dispute for Deliverables or services that do not comply

with the performance elements set forth in the Contract."

**Defendant's Wrongful Conduct and False Statements**

125.    Defendants knew or recklessly disregarded that Conduent lacked the IT resources

necessary to support its tolling clients, as well as the technology dependent, platform-based

service model.  Further, Defendants failed to disclose that the underlying IT infrastructure could

not support the Company's core businesses, including its tolling business.

126.    Defendants knew or recklessly disregarded that Conduent's service issues caused

by the Company's deficient IT infrastructure and sub-optimal performance by Atos were

impacting what Conduent defined as its core business.

127.    Defendants knew or recklessly disregarded that their 2017 and 2018 forecasts

were false and misleading because Conduent's IT infrastructure could not support the

Company's core businesses, including its tolling business.

128.    Defendants knew or recklessly disregarded that Conduent lacked a systems

inventory of the Company's legacy IT infrastructure necessary to consolidate the Company's

data centers.

129.    Defendants knew or recklessly disregarded that Atos was unable to create the systems inventory necessary to consolidate the Company's data centers. Accordingly, Defendants knew Conduent's IT consolidation was not "progressing well."

130.    Defendants knew or recklessly disregarded that if the inventory was incomplete or inaccurate, operations such as tolling would not run correctly when the data was transferred to a new facility, exposing the Company to penalties and other liability.

131.    Defendants knew or recklessly disregarded that Conduent took over direction of the data center consolidation from Atos and made no attempt to manually map the Company's legacy IT infrastructure. Defendants knew or recklessly disregarded that this decision would potentially expose the Company to penalties for poor performance and other liabilities.

132.    Defendants knew or recklessly disregarded that they had not "addressed" the Company's sub-optimized IT-related workforce and vendor relationships, as evidenced by Atos's inability to create a critical inventory of Conduent's legacy IT infrastructure.

133.    Defendants knew Conduent was constrained by its sub-optimized contract with Atos from realizing the benefits of the Strategic Transformation.

134.    Defendants knew or recklessly disregarded that Conduent's tolling clients were experiencing service issues caused by the Company's deficient IT infrastructure and sub-optimal performance by Atos.  Defendants knew or recklessly disregarded that by May 15, 2018, outages began impacting nearly all of Conduent's E-ZPass tolling clients on the East Coast.  Defendants also knew that as a result, on July 30, 2018, two U.S. senators asked the Federal Trade Commission to investigate Conduent's "pattern of mismanaging cashless tolling systems."[16]

---

[16] Frank Esposito, *Cashless tolls: Problems in New York, other states prompt request for federal probe*, lohud (Aug. 3, 2018).

135.    Defendant Vemuri admitted he was aware of at least 20 data center outages during Conduent's first two months of operation in 2017.[17]   He stated that he was deeply involved in overseeing Conduent's technology and was surprised that Conduent was operating its business using what he called a "1990s ecosystem" of mainframes and data centers, while "everybody else had moved to off-premise systems, moved into the cloud."  Defendant Vemuri admitted further that during Conduent's first 60 days of operation, he met with approximately 25 of Conduent's top clients and learned that the Company had problems managing its data.[18]

136.    Defendants knew Conduent was accruing material penalties and losing anticipated revenue for failure to perform as required by contracts with tolling clients.

137.    Defendants knew or recklessly disregarded that Conduent's transportation contracts included provisions that allowed the tolling clients to withhold payment for service failures or assess financial penalties against the Company for failing to meet the benchmarks established in the contracts for transaction posting or invoice processing. It knew that its inability to serve customers and failure to resolve existing issues would expose the Company to significant penalties under these contracts.

**The Securities Action**

138.    Plaintiff in the Securities Action filed its initial complaint on March 8, 2019 and the Amended Complaint on September 13, 2019. *In Re: Conduent, Inc. Securities Litigation*, Case No. 19-cv-8237 (D.N.J. March 8, 2019) The Amended Complaint asserts two counts of securities fraud: (I) violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder (against all Defendants) and (II) violations of Section 20(a) of the Securities Exchange Act (against the Individual Defendants).  It alleges Defendants overstated to

---

[17] Daniel Gross, *Shifting a Corporate Culture at Scale — and with Speed*, Business + Strategy (May 1, 2018).

[18] *Id.*

investors the progress that Conduent was making in modernizing the IT infrastructure supporting its electronic toll collection business, resulting in a significant drop in the company's stock price when Defendant Vemuri revealed the truth on November 7, 2018.

139.    The Amended Complaint also alleges a former Conduent employee confirmed Defendants knew or recklessly disregarded its failure to address the Company's legacy technology issues.  It states, "a former senior Conduent employee assigned to work on the 2018 data center transfer for Conduent's Transportation segment stated that the project was doomed from the outset, because (i) Conduent's legacy IT infrastructure compromised the functionality of the Company's applications during the transition; and (ii) Atos lacked the knowledge and skill to effectively support the transfer process." (Amended Complaint, ¶ 135).

140.    The Securities Action identified this individual as Confidential Witness 1 or CW1.  CW1 was allegedly Vice President of Enterprise Architecture for Conduent from approximately March 2017 until March 2019.  According to the Amended Complaint, CW1 worked remotely and reported to Kevin Gahan, Conduent's Senior Vice President, IT Solutions, who reported to Chief Information Officer, Carol Kline.  As Vice President of Enterprise Architecture, CW1 helped put together the IT group's business plan for Conduent's data center migration.  The IT business plan included information on cost estimates, cost savings, and information related to IT infrastructure replacement.  Additionally, CW1 participated in the execution of the data center migration. (Amended Complaint, ¶ 136). It further alleges:

> Prior to and during the data center migration, CW1 attended monthly governance meetings with Atos personnel to review Severity 1 or "Sev. 1" IT incidents. CW1 stated that these meetings were also attended by Bev Chamberlin, Conduent's Vice President and Head of Business Information Office, IT Strategy and Process, Kevin Gahan, Conduent's Senior Vice President, IT Solutions, and Rick Dastin, Conduent's Chief Technology and Product Officer. CW1 explained that Sev. 1 incidents were those that impacted multiple customers or had a significant impact

to Conduent's business. CW1 stated that outages were in a special category called Sev. 1+. According to CW1, during his tenure as Vice President of Enterprise Architecture there were anywhere from 6 to 12 Sev. 1 incidents per month.

According to CW1, Atos misstated its ability to acquire the requisite systems knowledge to execute the data center migrations effectively. CW1 stated that Conduent lacked a systems inventory and documentation about the Company's legacy IT infrastructure. CW1 stated that, in its Statement of Work, Atos was responsible for deploying a software program to recreate the inventory, but by summer 2018 Atos was only able to identify about 14 percent of Conduent's systems.

CW1 stated that as a result of Atos's failure to create the inventory, Conduent began directing the data center migration. CW1 stated that proceeding without Atos's inventory required Conduent to work with Atos to manually review the legacy IT infrastructure and map all of the systems that were to be transferred (*e.g.* servers, circuits, firewalls). According to CW1, there were problems with firewalls and load balancers that were unaccounted for in the legacy systems. CW1 explained that when Conduent performed the network cutover during the data center migration all of the gateways into the new data center were supposed to transition, but the unaccounted for firewall and load balancers impacted the transition, thereby causing the network outages that impacted Conduent's tolling customers.

(Amended Complaint, ¶¶ 137-139).

141.    Defendants' subsequent motion to dismiss the Amended Complaint was denied on

June 5, 2020. *Id.*, Dkt. No. 46.

142.    In denying the motion to dismiss, the court emphasized the following:

The Amended Complaint alleges that while discussing Conduent's Strategic Transformation program with investors on February 21, 2018, Mr. Vemuri stated that "[i]n 2017, we addressed our suboptimized IT-related workforce and vendor relationships. Next we expect to see benefits from the  platform rationalization work completed last year." On the same call, Mr. Vemuri further stated that "[d]uring the first year, we needed to inventory and rationalize our  technology portfolio. Starting in 2018, we'll begin our work to modernize our offerings with cutting-edge technology." Similarly, during an earnings call with investors on May 9, 2018, Mr. Vemuri stated that "[r]eal estate and IT consolidation remain large contributors to our transformation work and are progressing well." (internal citations omitted).

(*Id*. at 13-14).

143.    The Amended Complaint alleged further that Defendants omitted the following information from statements to investors: (1) known issues with the legacy IT infrastructure and vendor performance that were impacting Conduent's financial guidance and growth, (2) service issues experienced by multiple tolling clients that were caused by Conduent's deficient IT infrastructure and sub-optimal vendor performance, and (3) IT issues that caused the company to accrue material penalties and revenue losses for failing to perform under tolling clients' contracts. (*Id.*, Dkt. No. 18 at ¶¶ 114–19, 121–34, 151, 156, 160, 162–64).

144.    The court determined:

> Defendants' misrepresentations and omissions . . . were material because they created the misleading impression that Conduent would be able to achieve profitable growth based on its progress with the Strategic Transformation. The value of this information is reflected in Defendants' efforts to routinely inform investors about Strategic Transformation milestones, such as curing legacy IT inefficiencies by addressing the company's sub-optimal vendor relationships and progressing with the company's data center consolidation. . . . Without these misrepresentations, investors could only assume that the Strategic Transformation remained on track, despite Defendants' alleged knowledge to the contrary. . . . That Conduent's progress with the Strategic Transformation was material and impacted investment decisions is also reflected in the sharp drop in the company's stock price following Defendants' revelations that issues with Atos and legacy IT infrastructure negatively impacted financial performance.

(*Id.* Dkt. No. 18, at 9).[19]

145.    Further, the court found the allegations were plead with specificity, even under a heightened standard of review:

> The Court has reviewed these detailed allegations and the other factual allegations in the Amended Complaint and finds that Lead Plaintiff has met its heightened burden under the PSLRA to plead its allegations of misrepresentations and omissions with particularity. Accordingly, the Amended Complaint sufficiently alleges actionable and material

---

[19] The court cited *In re CIGNA Corp Sec. Litig.*, which held statements about the progress of a "Transformation project" by the defendants in that case were actionable. Civ. No. 02-8088, 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) (*Id.* at 10).

misrepresentations and omissions with the required specificity.

(*Id*. at 12).

146.    In the context of the scienter requirement, as it relates to the Individual Directors, the court stated:

> it seems implausible that Conduent's CEO and CFO were not aware of the problems with its tolling platform…, in view of (1) their identification of Conduent's tolling operations as a 'core' business segment, (2) the frequency and duration of the outages that its tolling platform experienced, including problems throughout 2018 in New York and a month-long outage in Florida; and (3) the number and amount of penalties that Conduent incurred as a result of those issues, including millions of dollars in fines from the Texas DOT, the NJ Turnpike Authority, and the Florida DOT.

(*Id*. at 16).[20]

147.    The court determined the circumstances "tend further to bolster the inference that the Individual Defendants 'knew at the time [their] statements were false or [were] reckless in disregarding the obvious risk of misleading the public.'" *Id*.  As for Conduent, the court found the "factual allegations, in view of the other allegations contained in the Amended Complaint regarding the importance of the data migration, the impact of infrastructure problems on the tolling business, and the core nature of the tolling business, support an inference of corporate scienter." (*Id*. at 17).   All in all, the court found allegations in the Amended Complaint "sufficient to meet Rule 8(a)'s standard requirement of a 'short and plain statement' of economic loss and its causal connection to alleged misrepresentations and/or omissions." (*Id* at 18).

**Defendant's Knowledge**

148.    Each of the Individual Defendants' statements alleged herein was made within the

---

[20] The court cited *In re Urban Outfitters, Inc. Sec. Litig.*,  for the notion that "misstatements and omissions made on 'core matters of central importance' to the company and its high-level executives give[] rise to an inference of scienter when taken together with additional allegations connecting the executives' positions to their knowledge" 103 F. Supp. 3d 635, 653 (E.D. Pa. 2015).

scope of his authority and is therefore chargeable against the Company.   The Individual Defendants directly participated in the management of the Company and had intimate knowledge of every aspect of Conduent's business, including the tolling business. The Individual Defendants were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business and operations.   The Individual Defendants were aware that Conduent's tolling operations were part of Conduent's core business operations. The Individual Defendants were aware of or recklessly disregarded the ongoing technology problems Conduent was experiencing in the Company's tolling business.   The Individual Defendants were directly or indirectly involved in drafting, producing, reviewing or disseminating the false and misleading statements and information.   The Individual Defendants were aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and the Individual Defendants approved or ratified these statements in violation of the federal securities laws.

**<u>Defendant's Fiduciary Duties</u>**

149.   By reason of their positions as officers, directors, and/or fiduciaries of Conduent and because of their ability to control the business and corporate affairs of the Company, at all relevant times, the Individual Defendants owed Conduent and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were required to act in furtherance of the best interests of Conduent and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit. Each director and officer of the Company owes to Conduent and its

shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Conduent, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with Conduent, each of the Individual Defendants had knowledge of material non-public information regarding the Company. To discharge their duties, the officers and directors of Conduent were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of Conduent were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable district and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## DAMAGE TO CONDUENT

150.    The Individual Defendant's conduct has resulted in more than $15 million in fines and penalties, and millions in lost or foregone revenue. For example:

(a) Various governmental entities in New Jersey demanded payment of $5,313,795.59 for failing to meet the requirements of the service contract from October 2017 through April 2018.

(b) The Florida DOT fined Conduent $800,000 in August 2018, $4.6 million in March 2019, and $3.7 million in June 2019. It also announced it would withhold all future payments to Conduent under its $287 million contract until the SunPass system was fully operational.

(c) The Texas DOT accessed over $944,303 in penalties to Conduent for the Company's failure to meet key performance indicators in their contract, including $196,890 in April 2018 for missing 618,192 tolling transactions.

(d) The Maryland Transportation Authority exercised its right to withhold payment from Conduent for non-performance related to Conduent's technology failures. It withheld $1.9 million designated for a project that was due on June 1, 2018 and remained incomplete 150 days later.

(e) Tolling outages have also put Conduent at risk for future penalties and foregone revenue with government customers in California, New York, North Carolina, Michigan, New Hampshire, and Rhode Island.

151.    Revelations of the Individual Defendants' conduct caused Conduent stock to fall dramatically. Conduent stock closed at $19.20 per share on November 6, 2018.  The next trading day, however, when the Individual Defendant's conduct was revealed, Conduent stock closed at $13.62 per share, a decline of $5.58 per share, or 29%.  (Securities Answer, ¶¶ 27, 207).  A November 7, 2018 BMO Capital Markets report took Conduent to task for misleading the market about the Company's problems, in particular its vendor issues:

> **Lots of problems?** Conduent spelled out five problems with its business: 1) longer sales cycle and ramp time; *2) vendor problems affecting operations; 3) underinvestment in legacy IT infrastructure;* 4) low European penetration outside of customer care contracts; and 5) deals slipping to future quarters. *We are surprised that Conduent disclosed so many problems and think management could have shared some of these issues with investors at an earlier time. For example, we think the issue with the IT providers has likely been a problem for some time.* (Emphasis added).

152.    Morgan Stanley agreed in a November 7, 2018 analyst report, lowering its 2018 and 2019 revenue projections to $5.37 billion (from $5.48 billion) and $4.74 billion (from $4.78 billion), respectively, its 2018 and 2019 EBITA estimates to $642 million and $647 million, respectively, and moving its price target to $16. In the same November 7, 2018 analyst report,

Morgan Stanley cited both the vendor contracts and IT infrastructure issues as reasons for lowering their expectations.

> **Legacy technology troubles.** Issues around legacy technology both inherited subcontractor contracts as well as underinvestment in infrastructure, caused delays in delivery performance. CNDT's poorly structured vendor contracts impacted the company's ability to deliver on service level agreements, resulting in penalties to CNDT. Separately, legacy IT infrastructure caused disruptions to operations, which negatively impacted client delivery.

153.    In the two years since, the Individual Defendant's conduct has caused the Company significant and irreparable reputational injury and loss of goodwill.

## NEW YORK LAW APPLIES UNDER
## THE INTERNAL AFFAIRS DOCTRINE

154.    New York generally recognizes the "internal affairs doctrine" which provides that "relationships between a Company and its directors and shareholders are generally governed by the substantive law of the jurisdiction of incorporation…" *Davis v. Scottish Re Group Limited*, 30 N.Y.3d 247, 253 (2017). Therefore, the substantive law of the State of New York is applicable to this action.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

155.    Pursuant to Section 1319(a)(2) of the New York Business Corporation Law (the "BCL"), its directors and officers are subject to BCL § 626, which provides that "[a]n action may be brought in the right of a domestic or foreign corporation to procure a judgment in its favor, by holder of shares . . . of the corporation; and pursuant to BCL § 1317(a)(2), its directors and officers are subject to BCL § 720, which provides that:

> (a) An action may be brought against one or more directors or officers of a corporation to procure a judgment for the following relief:

> > (1) Subject to any provision of the certificate of incorporation authorized pursuant to paragraph (b) of section 402, to compel the defendant to account for his official conduct in the following cases:

(A) The neglect of, or failure to perform, or other violation of his duties in the management and disposition of corporate assets committed to his charge.

(B) The acquisition by himself, transfer to others, loss or waste of corporate assets due to any neglect of, or failure to perform, or other violation of his duties.

(b) An action may be brought for the relief provided in this section . . . under section 626 (Shareholders' derivative action brought in the right of the corporation to procure a judgment in its favor), by a shareholder . . . .

156.     BCL § 626(c) provides that "[i]n any such action, the complaint shall set forth with particularity the efforts of the plaintiff to secure the initiation of such action by the board or the reasons for not making such effort."

157.     Here, demand upon the board of directors of Conduent to initiate litigation against the Individual Defendants is excused as futile.  The magnitude, duration, and purpose of the illicit activities shows that the Individual Defendants consented to, or recklessly disregarded, Conduent's illegal activities.  Defendant Webb-Walsh joined the Board in January 2016.  Defendant Webb-Walsh intentionally and/or recklessly violated his fiduciary duties to Conduent shareholders and lacks independence to consider a demand to file suit on behalf of Conduent against himself.  Demand on Defendant Webb-Walsh to bring this lawsuit or vigorously pursue it would be a futile and useless act as his conduct was illegal, not the product of the valid exercise of business judgment or candor, nor taken in good faith.  To bring this action, Defendant Webb Walsh would have to expose his own illegal behavior and potentially subject himself to substantial uninsured liabilities, which he will not do.

158.     Demand upon the other current board members is also futile.  It has now been more than two years since the Individual Defendants revealed their misdeeds, causing Conduent stock to plummet.  Over that time, the Board has either negligently failed to conduct an investigation on the benefits of bringing a against the Individual Defendants or has determined

not to do so despite Conduent suffering millions of dollars in damages due to the Individual Defendants breach of fiduciary duties – including the imposition of penalties, the costs of defending the Securities Action, and losses to reputation and good will.

159.   The Board learned of the Individual Defendants' wrongdoing sometime between 2017 and November 7, 2018.  Yet Defendant Vemuri remained CEO of Conduent until August 2019, more than 10 months after the latest possible moment the Board could have known of the Individual Defendants' breaches.  And even then, Conduent did not terminate Defendant Vemuri's employment.  He announced his voluntary resignation in May 2019 and remained CEO until August.  Not only did the Board fail to take action against Defendant Vemuri, it rewarded him with millions of dollars in salary increases.  Defendant Vemuri's total salary in 2017 and 2018 was $6,657,736 and $7,066,017, respectively.  In 2019, the Board authorized Defendant Vemuri's $11,843,058 salary, a more than $4.5 million increase from the two previous years, despite the fact that he was only an employee of the Company for eight months that year.

160.   Further, the Board has taken no action with respect to Defendant Webb Walsh who remains the CFO of Conduent to this day.  Notwithstanding the substantial allegations of wrongdoing against Defendant Webb Walsh in this complaint and in the initial complaint filed in the Securities Action nearly two years ago, "Brian [still] has global responsibility for all finance, treasury, investor relations, risk management, mergers and acquisitions, tax, audit and procurement at Conduent." Much like Defendant Vemuri, Conduent rewarded Defendant Webb Walsh with significant salary increase in 2019.  Defendant Webb Walsh's total salary in 2017 and 2018 was $1,486,152 and $1,961,273, respectively.   In 2019, the Board authorized Defendant Webb Walsh's $4,805,218 salary, a more than $2.8 million increase from the two previous years.

161.    In addition, commencing action against the Individual Defendants may prejudice the Company, which is a defendant in the Securities Action. Conduent, as a corporation, is charged with the actual knowledge of each of its senior officers, including each of the Individual Defendants.  Initiating litigation against the Individual Defendants for breach of their fiduciary duties would expose Conduent to millions of dollars in liability in the Securities Action. Accordingly, demand upon the Board is futile.

**FIRST CLAIM FOR RELIEF**
**(Derivative Claim for Breach of Fiduciary Duties Against the Individual Defendants**
**Pursuant to N.Y. Business Corporation Law § 626)**

162.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.  The Individual Defendants are fiduciaries of the Conduent and all of the Conduent's public shareholders and owe to them the duty to conduct the Company's business loyally, faithfully, diligently and prudently. This cause of action is asserted based upon the Individual Defendants' acts in violation of applicable law, which exposed the Company to significant liability. Such acts constitute a breach of fiduciary duty.  The Individual Defendants, in their roles as executives and/or directors of the Company, participated in the acts of mismanagement alleged herein and/or acted in gross disregard of the facts and/or failed to exercise due care to prevent the unlawful and ultra vires conduct complained of. The Individual Defendants are responsible for the gross mismanagement of the Company, for abdicating their corporate responsibilities and mismanaging the Company, in at least the following ways:

(i)     They caused the Company to violate the laws of the United States, including laws of the State of New Jersey;

(ii)    They made and caused the Company to make fraudulent representations about its capabilities and financial condition;

(iii)   They caused the Company to violate Sections 10(b) and 20(a) of Exchange Act;

(iv)    They have caused the Company to defend and face millions of dollars in potential liability in the Securities Action;

(v)     They caused the Company to violate customer contracts;

(vi)    They exposed the Company to massive monetary penalties and loss of revenue, as well as unnecessary legal fees, investigative expenses, and compliance costs by engaging *in ultra vires and* illegal conduct; and

(vii)   They subjected the Company to adverse publicity, loss of goodwill, and other reputational losses.

163.    As a result of the Individual Defendants' wrongful conduct and wrongful actions, including the failure to maintain a system of internal controls adequate to ensure the Company's compliance with all applicable laws and conventions, the Company has suffered considerable damage.  The Individual Defendants, singularly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.  The Individual Defendants abused the control vested in them by virtue of their high-level positions in the Company.  By reason of the foregoing, the Individual Defendants have breached their fiduciary obligations of loyalty, care, and candor to the Company, and the Company's shareholders.  The Company and the Company's shareholders have been injured by reason of the Individual Defendants' failure to exercise their fiduciary duties of loyalty, care, and candor.  Plaintiffs, as shareholders and representatives of the Company seek damages and other relief for the Company as hereinafter set forth.

**SECOND CLAIM FOR RELIEF**
**(Derivative Claim for Waste of Corporate Assets Against the Individual Defendants**
**Pursuant to N.Y. Business Corporation Law § 626 and § 720)**

164.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.  The Individual Defendants' breaches of their fiduciary obligations of loyalty, care, and candor have proximately, unreasonably, and unnecessarily caused the Company to wrongfully expend and continue to lose and waste billions of dollars of corporate assets.

46

## THIRD CLAIM FOR RELIEF
### (Common Law Derivative Claim for Waste of Corporate Assets Against the Individual Defendants)

165.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.  As a direct result of the wrongdoing alleged herein, the Individual Defendants have unreasonably and unnecessarily caused the Company to wrongfully expend and waste millions of dollars of corporate assets to the extreme detriment of the Company.

## FOURTH CLAIM FOR RELIEF
### (Common Law Derivative Claim for Aiding and Abetting Breaches of Fiduciary Duties Against the Individual Defendants)

166.    Plaintiffs hereby incorporate the allegations in the foregoing paragraphs as if fully set forth herein.  By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from government regulators, the Individual Defendants have each encouraged, facilitated and advanced their breaches of their fiduciary duties and wastes of corporate assets. In so doing, the Individual Defendants have each aided and abetted, conspired and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets and engage in the *ultra vires* and illegal conduct complained of herein.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their

unlawful conduct, including all salaries, bonuses, fees, stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

   C.   Awarding punitive damages;

   D.   Awarding costs and disbursements of this action, including reasonable attorneys', accountants', and experts' fees; and

   E.   Granting such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury with respect to each claim in this Complaint.


DATED:  January 21, 2021    **RIGRODSKY LAW, P.A.**

          By: */s/ Vincent A. Licata*
              Seth D. Rigrodsky
              Timothy J. MacFall
              Vincent A. Licata
              825 East Gate Boulevard, Suite 300
              Garden City, NY 11530
              Telephone: (516) 683-3516
              Facsimile: (302) 654-7530
              Email: sdr@rl-legal.com
              Email: tjm@rl-legal.com
              Email: vl@rl-legal.com


Joshua H. Grabar, Esq.
Grabar Law Office
One Liberty Place
1650 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:  267-507-6085
jgrabar@grabarlaw.com

*Attorneys for Plaintiff*